IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Criminal No. JFM-10-0798 |
| ANTONIO BENJAMIN MARTINEZ | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS INDICTMENT BASED ON GOVERNMENT'S BAD FAITH FAILURE TO RECORD CRUCIAL MEETINGS BETWEEN THE CONFIDENTIAL INFORMANT AND ANTONIO MARTINEZ**

**INTRODUCTION**

As set forth below, the government acted in bad faith by conducting its undercover sting investigation of Antonio Martinez in a manner that was intentionally designed to deprive the defense of important and potentially exculpatory evidence. The investigation was composed largely of a series of more than 20 meetings and telephone calls between a confidential informant and Mr. Martinez. Although the government recorded virtually all of these conversations, it conveniently failed to record four of the first five meetings between the informant and Mr. Martinez. These meetings were crucial, because it is there that the government claims Mr. Martinez conceived of and initiated the bombing plot for which he is here charged.

While surely aware that these first meetings were of paramount importance to the defense, the government intentionally chose not to record them. Without any such recordings, defense counsel is wholly unable to disprove the government's claims about what occurred at those meetings, and is left without a meaningful opportunity to defend their client. Although the defense believes that Mr. Martinez's alleged involvement in the bombing plot was the result of undue inducement and coercion by the government informant, it is now without the very evidence necessary to verify that

belief. The government has, seemingly in bad faith, deprived defense counsel of essential evidence "that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984) (footnote omitted). Accordingly, the Indictment in this case should be dismissed.

### STATEMENT OF FACTS

Antonio Martinez is here charged with Attempted Murder of a Federal Official, in violation of 18 U.S.C. § 1114(3), and Attempted Use of a Weapon of Mass Destruction, in violation of 18 U.S.C. § 2332a(a)(3). The charges arise from an FBI undercover sting investigation that resulted in the attempted detonation of a fake bomb at the Army Recruitment Office in Catonsville, Maryland on December 8, 2011. The sting was similar to several others conducted by the FBI in locations around the country in which a government informant induces an individual to participate in a "terrorist" bombing of a domestic target. The bombing plan itself follows a routine whereby an undercover operative supplies a vehicle containing an inert bomb. The vehicle is then positioned in proximity to a selected target and the individual is instructed to place a cell phone call to detonate the bomb. The bomb, of course, is incapable of detonation. Once the call has been made, the FBI move**s** in to arrest the individual.

According to discovery materials provided by the government, this undercover sting formally began in October of 2010, after a confidential informant brought to the attention of the FBI information about Mr. Martinez purportedly based on conversations with Mr. Martinez and later on Facebook postings that contained militant Islamic statements. Thereafter, the FBI apparently directed, allowed or acquiesced in the informant's utilization of a Facebook account under a false name to engage in private Facebook conversations with Mr. Martinez under false pretenses. These

conversations subsequently led to four face-to-face meetings between the informant and Mr. Martinez, on October 22, 25, 28, and 30, 2010, in which the bombing plot was allegedly hatched. None of these four meetings was recorded.

Between at least October 22, 2010, and continuing through December 8, 2010, the date of the detonation of the fake bomb, a series of face-to-face meetings and telephone conversations took place between the confidential informant (and later, an undercover agent supposedly introduced to Mr. Martinez by the informant) and Mr. Martinez. Although October 29, 2010 marked the first recorded conversation, the meeting on the following day, October 30, 2010, between Mr. Martinez and the informant was not recorded. After that October 30 meeting, it appears that recordings were made or at least attempted for all or virtually all subsequent meetings and conversations. Following the unsuccessful detonation of the fake bomb, Mr. Martinez was arrested and questioned by federal law enforcement authorities. Once again, the government chose to turn off the tape recorder during this period of questioning.

## ARGUMENT

The defense believes that the government's failure to record four of the first five meetings between the confidential informant and Antonio Martinez was done in bad faith, to allow the informant to shape the narrative of these conversations and induce Mr. Martinez into participating in the bomb plot, while ensuring that there would be no record of the critical meetings in which that plot was conceived. It is essential to both the defense and this Court that there be a record of these first meetings, to determine whether the crime in this case was the result of coercion and undue persuasion by the government informant, rather than any preconceived plan of Mr. Martinez. Law enforcement authorities have made sure that no such record exists.

3

The government had the equipment, the opportunity, and the ability to record the initial meetings between the informant and Mr. Martinez. They knew when and under what circumstances those meetings would take place, yet intentionally chose not to record them. Indeed, discovery produced by the government shows that by this time, the informant was acting under the express direction of the FBI and that, at least for the meetings on October 28 and October 30, the FBI directed the informant to provide the FBI with at least two hours notice of any meetings with Mr. Martinez. While virtually all of the conversations after October 30, 2010, involving Mr. Martinez were recorded, the government again chose not to record the questioning of Mr. Martinez by federal agents following his arrest. While the government usually is not required to record a suspect's interrogation, in the context of this case, the failure to record the questioning of Mr. Martinez further supports the theory that the government intentionally engaged in a pattern of selective recording so as to deny the defense access to crucial and potentially exculpatory evidence.

This pattern of selective recording smacks of bad faith, and has significantly impaired defense counsel's ability to effectively represent their client. Accordingly, the Indictment in this case should be dismissed. At the very least, the government should be called upon to explain and justify why the initial meetings with Mr. Martinez were not recorded, while all others were, and to produce all information in its possession, custody or control reflecting the content of those meetings.

**A.     The Government Violated Due Process By Intentionally Failing To Record Crucial Meetings Between The Informant And Antonio Martinez.**

Over 25 years ago, the Supreme Court announced:

> Under the Due Process Clause of the [Fifth] Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has

4

> developed what might loosely be called the area of constitutionally guaranteed access to evidence. Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

*California v. Trombetta*, 467 U.S. 479, 485 (1984) (quotation and citation omitted); *see also Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988) ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.") (quotation omitted).

In *Trombetta*, the Supreme Court established two criteria that a defendant must meet to establish a due process violation based on the government's failure to preserve evidence "that might be expected to play a significant role in the suspect's defense." 467 U.S. at 488 (footnote omitted). To meet this standard of constitutional materiality, evidence must possess apparent exculpatory value, and be of such a nature that the defendant is unable to obtain comparable evidence by other reasonably available means. *See id*. In *Youngblood*, the Court added a third criterion by requiring that the defendant show bad faith on the part of the police. *See* 488 U.S. at 58. Police act in bad faith when they intentionally fail to preserve potentially useful evidence "for the purpose of depriving the [defendant] of the use of that evidence during his criminal trial." *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000).

*Trombetta* and *Youngblood* both involved the government's failure to <u>preserve</u> evidence already in its possession.[1] Admittedly, these cases raise different issues than does a case where law

---

[1] *Trombetta* concerned the police's failure to preserve the breath samples of a defendant charged with drunk driving, and *Youngblood* involved the government's failure to preserve semen samples in a sexual assault case. Arguably, even this case involves the government's failure to preserve evidence in that it knew in advance of conversations of interest that would be occurring and yet failed to preserve the best evidence of those conversations in the form of recordings.

5

enforcement authorities make a conscious decision not to create potentially exculpatory evidence by failing to record crucial conversations between an informant and a defendant. Courts recognize, however, that the government's failure to create such evidence may rise to the level of a due process violation when it results from bad faith on the part of the investigating agents. *See Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) ("Although *Youngblood* does not directly apply because it dealt with failure to preserve rather than failure to gather potentially exculpatory evidence, there are similarities which persuade us.").

While, in the cases discussed below, the courts found that the government's failure to record meetings between an informant and the defendant were not the result of any bad faith, in each case, the court relied on facts in the record that are wholly absent here. Each court emphasized that this determination necessarily must be made on a case by case basis, and noted that, when the failure to record is due to bad faith on the part of law enforcement authorities, due process has been violated.[2]

For example, in *United States v. Brimage*, 115 F.3d 73 (1st Cir. 1997), the defendants claimed that, in an effort to avoid the creation of potentially exculpatory evidence, federal agents deliberately

---

[2] In addition to the cases cited below, *United States v. Williams*, 2010 WL 4595551 (N.D. Cal. Nov. 4, 2010) (unpublished), also indicates that the failure by investigating agents to record meetings between an informant and the defendant may rise to the level of a constitutional violation. In *Williams*, the court ruled, over the government's objection, that the defense was entitled to pretrial discovery of the policies of the ATF and the DOJ concerning the recording of contacts between informants and suspects. The court found that the defendant was entitled to learn of such policies because "he intends to argue that [the investigating agent] acted in bad faith in this case by failing to record the pre-transaction conversations because the recordings would have shown how defendant was induced to participate in [the charged crime]." *Id*. at *2. The court further stated: "Defendant is entitled to know what the ATF and DOJ policies are with respect to recording and memorializing conversations between informants and suspects and agents and suspects in order to support his bad faith argument and entrapment defense. The Court cannot decide whether those arguments will be successful as a matter of law at this juncture." *Id*. at *3. Implicit in this ruling in *Williams* is the recognition that, under certain circumstances, the government's failure to record meetings between an informant and a defendant may violate due process.

failed to record meetings between the defendants and an informant that resulted in the defendants' participation in a robbery. In response, the government argued that it was under no obligation whatsoever to record such meetings, asserting instead that the bad faith test of *Trombetta* and *Youngblood* was limited only to the failure to preserve already existing evidence. The court rejected the government's position, emphasizing that "it is not particularly helpful to think of the issue as broadly as the government frames it: that there is absolutely no duty on the part of the government to 'create' evidence." *Id*. at 76. The court noted: "The issue is whether the fair trial rights of the defendants have somehow been violated by the failure to record. Some situations may raise concerns about whether the government is putting the due process rights of defendants at risk." *Id*. at 77. The court further stated:

> Given the vastly different fact patterns in which this issue may arise, we see no reason to adopt the government's position that a decision by law enforcement officials not to record key conversations (to be relied on in the prosecution) between a defendant and a confidential informant may never be probed to determine if the decision was made in bad faith.

*Id*.

In *Brimage*, the court found that the government did not act in bad faith, based on the investigating agent's testimony that his squad usually monitored but did not record sting operations primarily to protect the confidential informant, rather than to avoid creating potentially exculpatory evidence. *See id.* Here, of course, the government cannot make the same claim. Law enforcement authorities in this case chose to record all but four meetings between the informant and Mr. Martinez. The failure to record the initial meetings cannot be justified by any perceived need to protect the informant.

In *United States v. Chaudhry*, 850 F.2d 851 (1st Cir. 1988), a DEA agent instructed a

7

confidential informant to record conversations with the defendant "whenever possible." The informant subsequently recorded some but not all of these conversations. Although finding that the informant's failure to record all of the conversations did not violate due process, because there was no evidence of bad faith, the court recognized that "there may be a case where selective recording presents a reviewing court with constitutional concerns." *Id*. at 857.

In finding no bad faith on the part of the government, the court in *Chaudhry* relied on the informant's testimony that, while he was successful in recording some conversations with the defendant, others "went by the boards." Often, the informant stated, the defendant "would call him at work or during the wee hours, catching him unprepared or otherwise unable to record." The court found that, on this record, "it is surpassingly difficult to suggest that the recording was consciously 'selective' at all; rather, it seems to have been fortuitous." *Id*.

Conversely, in this case, the confidential informant was never caught off guard by any last minute request for a meeting by Mr. Martinez. Rather, law enforcement authorities knew exactly when and under what circumstances the four unrecorded meetings between the informant and Mr. Martinez would occur as the informant was making the arrangements at the direction of the FBI and contemporaneously communicating the details of those arrangements to the FBI, yet intentionally chose not to record them.

Finally, in *United States v. Olson*, 978 F.2d 1472 (7th Cir. 1992), the defendant argued that the government purposely failed to record the crucial first conversation between him and a confidential informant. The court found otherwise, stating: "[T]he failure to record the initial contact [between the informant and the defendant] appears less deliberate and more a result of negligence by failing to get a recording device from the Chicago DEA office to Florida. Mere negligence cannot

serve as the predicate for government misconduct." *Id*. at 1482.[3] The court emphasized, however, that "it is conceivable that a deliberate failure to preserve evidence of initial contacts with a suspect may raise doubt as to the defendant's predisposition to commit the crime." *Id*.

Here, unlike in *Olson*, the government's failure to record four of the first five meetings between the informant and Mr. Martinez cannot be explained as the result of mere negligence. Law enforcement authorities in this case knew when and where these meetings would occur, were directing the actions of the informant, and had the equipment readily available to record these initial meetings, yet made an intentional, not a negligent, decision not to.

Other cases address whether the government violated the Jencks Act by intentionally failing to memorialize the questioning of a defendant. These cases are also useful here, because, in each, the court was highly critical of the government's intentional failure to create potentially exculpatory evidence. These courts expressed disdain for the practice whereby agents make no record of their questioning of a defendant. While recognizing that agents are under no legal obligation to tape record or memorialize interrogation sessions, these courts emphasized that the failure to do so is inconsistent with the integrity we expect of federal law enforcement authorities.

For example, in *United States v. Houlihan*, 92 F.3d 1271 (1st Cir. 1996), a court considered whether the government's instruction to agents to minimize note taking during their interview with a suspect violated the Jencks Act. While finding that such a practice did not violate the Act, the court nonetheless warned:

---

[3] The *Olson* Court also emphasized that the defendant's predisposition to commit the crime was already established based on his prior convictions and his previous association with the drug trade. *See id*. at 1482. Here, of course, Mr. Martinez had no prior conviction for any terrorist-related activity, and no previous association with any terrorist group.

9

> Eschewing tape recordings and ordering law enforcement agents not to take notes during pretrial interviews is risky business – and not guaranteed to redound either to the sovereign's credit or to its benefit. By adopting a "what we don't create can't come back to haunt us" approach, prosecutors demean their primary mission: to see that justice is done. . . . By and large, the legitimate interests of law enforcement will be better served by using recording equipment and/or taking accurate notes than by playing hide-and-seek.

*Id*. at 1289.

Likewise, in *United States v. Bernard*, 625 F.2d 854 (9th Cir. 1980), the court found that an investigating agent did not violate the Jencks Act by intentionally failing to make notes of his interviews with a defendant, yet severely condemned the government's policy of willfully avoiding the creation of potentially exculpatory evidence:

> We emphatically disapprove of [the agent's] views and motivation, and his conduct. His testimony announces a desire to deprive defendants of knowledge of any statements favorable to them that may have been made to him by the informant. This seems to us to be quite inconsistent with the obligations of a law enforcement officer representing the United States Government. Such an officer has a duty to gather all of the facts about an offense, so far as time and his abilities permit, not just those facts that the agent thinks helpful to obtaining a conviction. His superiors and the prosecuting authorities must rely on him to do so. Both he and they have a duty to protect the innocent as well as to catch and prosecute the guilty. And that duty extends to being fair to those whom he may believe to be guilty. Playing games with evidence, as [the agent] has done, demeans him, his agency, and the government itself.

*Id*. at 859.

In this case, it is difficult to reach any conclusion other than that the government's pattern of selective recording was consciously designed to prevent the creation of potentially exculpatory evidence that could have played a significant role in Mr. Martinez's defense. Such conduct reveals bad faith on the part of the government, and constitutes outrageous conduct that violated due process. *See, e.g., United States v. Lakhani*, 480 F.3d 171, 177-78 (3rd Cir. 2007) (when government conduct

10

is "so outrageous" as to be "shocking to the universal sense of justice," then the Due Process Clause can function as an "absolut[e] bar [on] the [G]overnment from invoking judicial processes to obtain a conviction") (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)); *Hampton v. United States*, 425 U.S. 484, 494 n.6 (1976) ("The fact that there is sometimes no sharply defined standard against which to make these judgments is not itself a sufficient reason to deny the federal judiciary's power to make them when warranted by the circumstances.").

This Court should not countenance the government's outrageous conduct in this case. Such conduct is inconsistent with the fundamental fairness guaranteed criminal defendants by the Due Process Clause, and demeans and denigrates the integrity with which we expect the federal government to operate in prosecuting a criminal defendant. Accordingly, the Indictment in this case should be dismissed. At the very least, the government should be called upon to explain and justify why four of the five initial meetings with Mr. Martinez were not recorded, while all others were and to produce all information in its possession, custody or control of the content of those meetings.

**B.      Evidence Of The First Meetings Between The Informant And Mr. Martinez Is Crucial To Determining Whether The Charged Offense Was The Product Of Entrapment, Particularly Given That Mr. Martinez Was Not Predisposed To Commit A Terrorist Crime.  Through Its Pattern Of Selective Recording, The Government Has Made It Exceedingly Difficult, If Not Impossible, To Determine Whether The Informant Improperly Induced And Persuaded Mr. Martinez To Commit The Charged Offense.**

"In their zeal to enforce the law, . . . Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 549 (1992). The defense of entrapment was specifically designed to overcome such conduct, whereby "the Government plays on the weaknesses of an innocent party and beguiles him

11

into committing crimes which he otherwise would not have attempted." *Sherman v. United States*, 356 U.S. 369, 376 (1958) (footnote omitted).[4]

An entrapment defense has two elements – a lack of predisposition on the part of the defendant to commit the charged crime, and government inducement of that crime. *See, e.g., Mathews v. United States*, 485 U.S. 58, 63 (1988); *United States v. Squillacote*, 221 F.3d 542, 564 (4th Cir. 2000). In determining whether the defendant was predisposed to commit the criminal act, courts look to several factors, such as:

> [T]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. Fedroff*, 874 F.2d 178 184 (3rd Cir. 1989); *see United States v. Miller*, 510 F.3d 668, 676 (7th Cir. 2007) (same); *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990) (same). A court may also consider whether there was an existing course of criminal conduct similar to that for which the defendant is charged, and whether there was an already formed design on the part of the accused to commit the alleged crime. *See Fedroff*, 874 F.2d at 184-85.

Application of these factors here reveal a lack of predisposition on the part of Mr. Martinez to commit the charged offense. Prior to this case, Mr. Martinez had no reputation for being a terrorist, and no prior record of committing any terrorist-related crime. In his public postings on

---

[4] *See also United States v. West*, 511 F.2d 1083, 1085 (3rd Cir. 1975) (it "serves no justifying social objective" for the government to "creat[e] new crime for the sake of bringing charges against a person [it] had persuaded to participate in wrongdoing"); *United States v. Archer*, 486 F.2d 670, 677 (2nd Cir. 1973) (Friendly, J.) ("Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.").

Facebook, Mr. Martinez, like a myriad of other young Muslims, made militant Islamic statements, but never suggested that he was willing to engage in any terrorist activity. He also did not participate in the charged crime for profit. He was not engaged in an already existing course of terrorist conduct. Although the government's decision not to record four of the first five meetings between the confidential informant and Mr. Martinez now makes it difficult to determine for sure, it is reasonable to infer that the bombing plot, as it was developed in those first meetings, was in large measure designed by the informant, not Mr. Martinez. The failure to record these first meetings has also made it quite difficult to determine whether Mr. Martinez initially expressed reluctance to commit the terrorist offense, and only chose to do so after being repeatedly badgered by the informant.

Mr. Martinez's lack of predisposition makes it even more important to determine the nature of the government's inducement in this case. The intentional decision by law enforcement authorities not to record the first meetings involving Mr. Martinez has made this determination virtually impossible. Without any such recordings, neither this Court nor the defense is able to determine whether the informant acted in a way that "creat[ed] a substantial risk that an otherwise law-abiding citizen would commit an offense, [through] persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir.1994); *see also United States v. Sligh*, 142 F.3d 761, 762 (4th Cir. 1998) ("'Inducement' is a term of art: it involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party.").

The legal question of entrapment arises most often in cases, like this one, that involve an

undercover sting operation. While courts agree that police may employ certain tactics to catch those engaged in criminal enterprises, including such a sting, they are equally in agreement that law enforcement authorities are prohibited from conceiving of a crime, and then unduly persuading an individual to commit that crime.[5] In assessing whether the government has implanted in a suspect's mind the decision to commit a crime that otherwise would not have occurred, the initial meetings between an informant and the suspect are essential, because it is there that evidence of improper government inducement will be found. In this case, evidence of those essential meetings does not exist, due to the government's conscious decision to not record them. The defense is hamstrung as a result.

C.  **As a Result Of The Government's Bad Faith, The Indictment In This Case Should Be Dismissed.**

While generally a question for jurors, when undisputed facts establish entrapment as a matter of law, the proper remedy is dismissal of the indictment. *See Sherman*, 356 U.S. at 373-76; *United States v. Schaffer*, 518 F.3d 414, 426 (6th Cir. 2009) (same). Of course, had the government tape recorded the four initial meetings between the informant and Mr. Martinez, and those tapes revealed entrapment on the part of the informant, there would now exist exactly this sort of indisputable evidence.

Dismissal of an indictment is also appropriate when the government engages in outrageous conduct. *See Russell*, 411 U.S. at 431-32 (when it engages in outrageous conduct, "the government

---

[5] *See, e.g., United States v. Lard*, 734 F.2d 1290, 1292, 1296-97 (8th Cir. 1984) (due process violated where ATF agents assisted defendants in making pipe bomb); *United States v. Twigg*, 588 F.2d 373, 382 (3rd Cir. 1978) (due process violated where DEA agents concocted drug crime and provided defendants with means to accomplish it); *United States v. Greene*, 454 F.2d 783, 787 (9th Cir. 1971) (due process violated where government manufactured crime for sole purpose of convicting defendant).

14

should be absolutely barred from invoking judicial process to obtain a conviction"). In this case, the government acted outrageously by deciding, in bad faith, to avoid creating tape recordings that would have memorialized four of the first five meetings between the confidential informant and Antonio Martinez. As a result, Mr. Martinez is now severely handicapped in, and perhaps incapable of, establishing that he was legally entrapped by the informant. Such bad faith by the government is inconsistent with the fundamental fairness guaranteed by due process, and demands that the Indictment in this case be dismissed.

Respectfully submitted,

JAMES WYDA
Federal Public Defender


/S/
_____
JOSEPH A. BALTER         #04496
Deputy Federal Public Defender


/S/
_____
JULIE LEE BETH JOHNSON    #27746
Assistant Federal Public Defender

Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: joseph_balter@fd.org
       julie_johnson@fd.org