**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. JFM-10-0798** |
| | * | |
| **ANTONIO BENJAMIN MARTINEZ,** | * | |
| **a/k/a Muhammad Hussain** | * | |
| | ****** | |

## GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE
## EXPERT TESTIMONY BY DEFENSE WITNESS JAMES WEDICK

The United States of America, by and through its counsel, Rod J. Rosenstein, United States

Attorney for the District of Maryland, and Christine Manuelian, Assistant United States Attorney

for said District, hereby moves to preclude the defense from calling James Wedick as an expert

witness to testify on FBI policy and procedure and the opinions set forth in his report dated October

20, 2011.[1] As set forth below, the proffered expert testimony is irrelevant and inadmissible pursuant

to Rules 402, 403 and 702 of the Federal Rules of Evidence.

Testimony from a witness qualified as an expert is admissible under Fed.R.Evid. 702 if it

concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other

trier of fact to understand or resolve a fact at issue.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
> or date, (2) the testimony is the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993), the

---

[1] Mr. Wedick's report is attached as an exhibit to the defendant's reply, filed October 21,
2011, to the government's response to the motion to dismiss the indictment.

Supreme Court set forth a two-prong test for assessing the admissibility of expert testimony under Rule 702.   The first prong of the inquiry examines whether the reasoning and methodology underlying the expert's proffered opinion is reliable.   509 U.S. at 593-95.   The second prong requires an analysis of whether the opinion is relevant to the fact at issue.   *Id.* at 591-92, 595.   *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167 (1999) (extending *Daubert* analysis to all expert testimony).

As the Fourth Circuit noted in *United States v. Dorsey,* 45 F.3d 809 (4th Cir.1995), it is a well-settled principle that, "even under the *Daubert* analysis, a trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony." *Id.* at 814 (citing *United States v. Bynum*, 3 F.3d 769 (4th Cir. 1993)).   Because expert evidence has the potential to "'be both powerful and quite misleading,'" it is incumbent upon the trial judge to "be mindful of other evidentiary rules, such as [Fed.R.Evid.] 403, which permits the exclusion of relevant evidence "'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.'" *Id.* at 813 (quoting *Daubert,* 509 U.S. at 595).

In his report, Mr. Wedick claims that the FBI failed to follow its own administrative guidelines and those of the Attorney General by not formally opening an investigation against the defendant prior to October 27, 2010, and by not recording the defendant's conversations with the confidential source until October 29, 2010.   Wedick opines that the FBI had sufficient information to open an investigation and obtain authority to monitor and record conversations with the defendant at four separate points: October 21, October 22, October 25, and October 27-28.   In addition, he opines that the FBI's alleged inattention and delayed response in conducting its investigation against the defendant was "not commensurate with generally accepted reasonable FBI investigative

2

practices," constituted a "serious departure from the FBI's authorized mandate to respond quickly

to threats," and exhibited "reckless disregard of [the FBI's] duty to collect evidence." These

opinions are based on Wedick's experience as an FBI agent investigating white collar crimes prior

to his retirement in April 2004.

## A.    The Proffered Expert Testimony is Not Relevant

The Supreme Court recognized long ago that unless an agency regulation is mandated by the

Constitution or federal law, the agency's failure to follow its regulation is not violative of a

defendant's constitutional rights. *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465 (1979).

*Caceres* concerned the failure of Internal Revenue Service agents to follow the agency's electronic

surveillance approval process prior to recording the defendant's conversations. The Court held that

because an agency is "not required either by the Constitution ... or by statute ... to adopt any

particular procedures or rules before engaging in consensual monitoring and recording ... [n]one of

the [defendant's] constitutional rights were violated either by the actual recording or by the agency's

violation of its own regulations." *Id*. at 741-42 [citations omitted]. The Court also concluded that

the agency's interpretation of its regulations, "even if erroneous," did not raise any constitutional

issues, and the agency violation did not implicate the Due Process Clause, as the defendant had no

knowledge he was being recorded, and thus, could not "reasonably contend that he relied on the

regulations or that their breach had any effect on his conduct." *Id*. at 742. Finally, the Court held

that suppression of the recordings through application of the exclusionary rule was inappropriate and

refused to adopt a rigid rule of exclusion as a remedy for administrative violations. *Id*. The Court

also refused to adopt the case-by-case exclusionary analysis proffered by the defendant, noting that

the action of the IRS agents "reflected a reasonable, good-faith attempt to comply" with the agency's

3

internal guidelines. *Id*. at 756-57.

Following the decision in *Caceres*, courts in this circuit and others have refused to suppress evidence or reverse convictions based solely on the failure to follow administrative policies or regulations.  For example, in *United States v. Jones*, 13 F.3d 100 (4th Cir. 1993), the defendant, a postal worker, engaged in multiple discussions with another postal employee both on an off postal property regarding the defendant's ability to procure drugs.  The employee was subsequently directed by a Postal Service agent to engage the defendant in a recorded drug conversation while on postal property, which subsequently led to the drug transactions for which the defendant was charged.  Much like the defendant in this case, defendant Jones unsuccessfully moved to dismiss his indictment and suppress the evidence, claiming that the manner in which the Postal Service conducted its investigation was outrageous and violative of the Fifth Amendment's due process protections.

On appeal, the Fourth Circuit upheld the district court's denial of the defendant's motion. "An interagency memorandum ... is generally not a sound basis for suppressing evidence where no statutory or constitutional infraction has occurred," *Id*. at 103 (citing *Caceres*, 440 U.S. at 754-55), nor is "suppression of the evidence obtained or reversal of the conviction" an "appropriate remedy for an unauthorized investigation."  *Id*.  As the court noted, "a generalized claim of outrageous misconduct based on the Due Process Clause of the Fifth Amendment is difficult to make out .... '[T]he doctrine is moribund ... [and] courts have rejected its application with almost monotonous regularity ....'"  *Id*. (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)).  Rather, the defendant must make a particularized showing that the an agency's investigative conduct "was of such character as to violate general standards of fundamental fairness" in order to warrant dismissal

of an indictment.  *Id.* at 104-05.  The appellate court ultimately dispatched the defendant's claim as unsupported and an inappropriate attempt to establish an entrapment claim, which was more properly an issue for the jury, not the court.  13 F.3d at 104.

In *United State v. Hassan, et al.*, 747 F.Supp.2d 642 (E.D.Va. 2010), the defendants claimed that the failure of NCIS agents to record their interviews constituted a breach of agency procedure requiring suppression of the defendants' resulting statements.  The district court held that suppression of evidence was dependent upon compliance with constitutional requirements, not agency regulations and procedures.  *Id.* at 682 (citing *Caceres*, 440 U.S. at 749-56, and *In re Shain*, 978 F.2d 850, 854 (4th Cir. 1992) (DOJ regulation is not enforced by courts through exclusion of evidence, but internally by a government department)).  "[E]ven if the failure to record the interviews did, in fact, constitute a breach of NCIS procedure, there simply does not appear to be a constitutional dimension to that failure that would justify suppression of Defendants' statements during those interviews."  *Id*.  On that basis, the district court denied the defendants' Rule 16 discovery demand for disclosure of NCIS regulations, manuals, and standard operating procedures governing interrogations and investigations, as the information would not have "'enable[d] [Defendants] significantly to alter the quantum of proof in [their] favor.'"  *Id*. (quoting *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (internal citation omitted)).  *See also United States v. Mauser*, 723 F.Supp. 995, 1001-02 (S.D.N.Y. 1989) (relying on *Caceres*, district judge held that alleged violation of IRS regulations regarding *Miranda* warnings in non-custodial interview did not violate due process or require suppression of evidence obtained during the interview).

Due process does not require that law enforcement gather evidence.  *See United States v. Weisz, et al.*, 718 F.2d 413, 435-37 (D.C.Cir. 1984) (rejecting claim of Abscam defendant that he

was denied due process and improperly deprived of allegedly exculpatory evidence by agents' failure to record all conversations during the investigation, and holding that there was no constitutional obligation requiring the FBI to record or memorialize all conversations with persons suspected of criminal activity). It is only when law enforcement acts in bad faith in failing to preserve potentially useful evidence that due process is breached. *Arizona v. Youngblood*, 488 U.S. 51 (1988). The violation of an agency regulation, however, is not, by itself, proof of governmental bad faith. Rather, the defendant must establish fraud or deceit on the part of the government. *Groder v. United States*, 816 F.2d 139, 144 (4th Cir. 1987).

Having failed to come forward with anything that suggests, let alone establishes, bad faith on the part of the FBI in the instant case, the defense attempts to trot out a former, long-retired, white-collar agent with no experience in terrorism investigations to "interpret" internal FBI and DOJ guidelines that are neither constitutionally nor statutorily required, and if violated, would not redound to the benefit of the defendant under the precepts set forth in *Caceres* and its progeny.

Like the defendant herein, the defendant in *United States v. Lecco*, 2010 WL 1507891 (S.D.W.Va. April 14, 2010) (unpublished), sought to demonstrate that the investigating agents had conducted a sloppy investigation and acted in bad faith in pursuing him because they allegedly failed to follow FBI and DOJ procedures. As his evidence of that, the defendant attempted to offer two former FBI agents as experts on internal FBI guidelines, and have them opine on FBI and DOJ procedures allegedly violated by the case agents. The district court, relying on *Caceres* and *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003), granted the government's motion to exclude the testimony and disallowed the defendant from relying on agency guidelines or procedures to establish his claims. *Lecco*, slip op. at *3. "[T]he law 'does not provide license for courts to police

compliance with' internal agency protocols.   Defendant's approach would essentially shift this prohibited policing function from the court to the jury.  Doing so works the same harm identified by *Caceres*." *Lecco*, slip op. at *3 (quoting *Jackson*, 327 F.3d at 295 (DOJ charging protocols do not vest rights in the defendant), and citing *Caceres*, 440 U.S. at 755).  As the district judge noted, "a third party may not exploit an agency's internal guidelines for his own legal advantage."  *Id*.

In *Groder, supra*, the defendant alleged that the IRS revenue agent investigating his activities had violated IRS guidelines specifying the circumstances upon which a civil audit should be suspended and referred for criminal investigation.  The Fourth Circuit upheld the district judge's finding that there was "'no evidence of bad faith or intent to deceive on the part of the agent of her supervisors,'" even though "'a more experienced agent would have discontinued the investigation at an earlier stage.'" 816 F.2d at 144-45.  In so doing, the appellate court noted:

> Honest differences of opinion over the timing of referral simply cannot afford the basis for judicial intervention into the normal tax enforcement procedures of the Service. If that were so, the timing of every referral would become a matter of potential litigation and federal judges would be tempted to supplant the hard judgment calls of revenue agents in the field with their own notions of how tax laws should be enforced. We cannot encourage such a portentious shift in governmental responsibilities....The same concern leads us to reject taxpayer's attempt to introduce a "reasonable agent" standard into referral questions. Such a standard would mire courts in an inquiry on the "reasonableness" or "objective good faith" of every referral decision.

*Id*. at 145.

The defendant is trying to do exactly what the Fourth Circuit deemed inappropriate in *Groder* - supplant the reasoned judgment of the agents in the field responding to the circumstances as they developed, with that of a retired white-collar agent turned private eye acting as a Monday morning quarterback second-guessing how he would have done it better.  The defendant not only improperly

relies upon the proffered expert's opinion as a basis for his bad faith claim, he is attempting to conduct a mini-trial in which his expert's opinion simply does not matter, has no probative value, and is misleading. Wedick's opinion is irrelevant evidence that should be excluded pursuant to Fed.R.Evid. 402, and even if deemed relevant by the Court, should be excluded under Fed.R.Evid.403, as prejudicial, confusing, and a waste of time.

**B.    The Proffered Expert Testimony is Not Reliable**

Where a party offers an expert to give an opinion based on his prior experience, "the district court must ... require [the] experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (citing Fed.R.Evid. 702 advisory committee notes). "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). *See United States v. Chang*, 207 F.3d 1169, 1172-73, n.2 (9th Cir. 2000) ("extremely qualified" expert in finance properly precluded from testifying about authenticity of certificate given that he had no experience in identification of counterfeit securities).

Expert testimony is inadmissible it if does no more than tell the finder of fact what conclusion to reach. "When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Duncan*, 42 F.3d 91, 101 (2d Cir. 1994) (emphasis in text). *See also Berry*, 25 F.3d at 1350-53 (rejecting expert's testimony that police officer's actions were neither justified nor warranted under the circumstances and totally improper; testimony merely told jury what result

to reach).

An "opinion" that merely advances factual assertions about the evidence that defense counsel is free to offer in argument does not meet the "helpfulness" requirement of Rule 702 and should be excluded. *United States v. Barsanti*, 943 F.2d 428, 432-33 (4th Cir. 1991); *United States v. Fowler*, 932 F.2d 306, 315 (4th Cir. 1991). *See also United States v. Fletcher*, 928 F.2d 495, 503-04 (2d Cir. 1991).

> [T]rial courts must be wary lest the expert become nothing more than an advocate of policy before the jury. Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument. Indeed, the premise of receiving expert testimony is that it "will assist the trier of fact to understand the evidence or to determine a fact in issue...."

*In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1966). *See also United States v. Johnson*, 617 F.3d 286, 294-95 (4th Cir. 2010) (admission of agent's lay opinion on meaning of drug-related slang not harmless under Rule 701 and would likely have been disallowed as expert testimony under Rule 702 given lack of evidence establishing reliability of agent's methodology and guiding principles in decoding the slang).

The defendant has failed to lay a proper factual foundation for admission of his expert's opinions. The defendant fails to articulate how his expert's background as a white-collar investigator is reliably applied to the facts of this case, especially where his "expert" has no experience in investigating terrorism-related crimes or knowledge of the particular concerns that arise in those types of investigations. More significantly, the defendant's expert has relied on incorrect facts in rendering his opinion.

First, Mr. Wedick makes much of a meeting he mistakenly believes occurred on October 21, 2010, between the confidential source and the defendant. His belief appears to be premised on a

report authored by the case agent on November 20, 2010, documenting information received from the confidential source. *See* Wedick Op. at 3, 5, 8. The information contained in the agent's report dovetails with the information provided by the source to the case agent following his meeting with the defendant on October 28, 2010, which is also memorialized, in part: 1) in a report generated by the case agent on that same date (attached hereto in Exhibit B at 48); 2) in an e-mail from the case agent to his supervisor on October 29 (Ex. B at 47); and 3) in the confidential source's notes of the October 28 meeting (previously provided to defense counsel in discovery). At the time the case agent's report was provided in discovery, undersigned counsel advised defense counsel that the date contained in the agent's report was in error, and should have reflected that the information pertained to the October 28, 2010, meeting. *See* Exhibit A. It was during that meeting on October 28, 2010 - not October 21 as Wedick believes - that the defendant first identified his intended target.

Second, Mr. Wedick has formulated much of his opinion without relevant and critical information. As evidenced by e-mails between the case agent, his supervisors and other FBI personnel contained in Exhibit B, the case agent appropriately sought the necessary approvals, per FBI and AG guidelines, to monitor and record the defendant's conversations with the confidential source. This included obtaining permission from FBI personnel and the U.S. Attorney's Office to allow the confidential source to engage in otherwise illegal activity (OIA) (i.e., continuing his conversations with the defendant regarding attack planning). That approval was secured on October 28, 2010, a few hours after the confidential source had notified the case agent that the defendant wanted to meet later that evening. As evidenced by the e-mail chain, equipment was not available to record the meeting that evening.

Finally, much of Mr. Wedick's "opinion" is pure conjecture about the state of mind of the

10

case agent and confidential source. For example, Wedick puts forth the following missives: "Not getting telephonic approval to monitor/record conversations suggests either the investigator did not believe the CHS or that he thought MARTINEZ was 'not' capable of the threats." Wedick Op. at 5. Later in his report, he asserts that the case agent "change[d] his mind" about recording the meeting on October 28, and this alleged decision "must have been troubling news for the CHS attempting to plan [for the meeting] .... Thinking what [the case agent] might say and planning for the conversations, the FBI's last minute cancelation [sic] had to shake the CHS' confidence and make him wonder when the Bureau might try to corroborate his statement." Wedick Op. at 7. He then boldly asserts that the agent "decide[d] 'not' to cover the [October 28] meeting" as part of his justification for concluding that FBI seriously departed from established FBI practice. Wedick Op. at 7.

Mr. Wedick's attempts at clairvoyance to justify his conclusions are quite remarkable and underscore their unreliability. Moreover, many of his opinions do not appear to be based on anything other than what he himself believes to be appropriate investigative practice. Statements such as – "As a matter of practicality, authorities usually try to wire up an informant sooner rather than later" (Wedick Op. at 5); the agent's actions were "a serious departure from the FBI's legislative mandate to respond quickly to threats" (Wedick Op. at 6); and failing to record consensual conversations "can be considered a serious departure from the FBI's standard operating procedures" (Wedick Op. at 6) – are simply proclaimed without any foundation.

The issue for the Court is whether the FBI exercised bad faith in how it handled the early stages of the investigation. The Court needs no specialized knowledge or assistance to evaluate this issue. And it certainly cannot, and should not, rely on the opinion of a long-retired white-collar

agent not versed in issues that arise in terrorism-related investigations that is based on misinformation, no foundation, and rank speculation.[2]

_____

[2] Some of Mr. Wedick's comments seem to suggest his belief that the FBI had a duty to "wrap the investigation up as soon as possible"and likely could have done so had those first few meetings been recorded.  Wedick Op. at 7.  This ill-informed and incorrect legal conclusion is not surprising given Wedick's past attempts at challenging the FBI's handling of investigations in other terrorism-related cases.  For example, in *United States v. Hayat*, 2007 WL 1454280 (E.D.Ca. May 17, 2007) (unpublished), the defense sought to offer Wedick as an expert to attack multiple aspects of the manner and methods utilized by the FBI in interrogating him, including the agents' alleged failure in taking into account the defendant's perceived vulnerabilities.  The district judge, after undertaking a thorough analysis of the facts and Rule 702 caselaw, found Wedick's qualifications insufficient for the opinions he sought to offer, found that his proffered testimony was nothing more than an attempt to invade the province of the jury, and found that his opinions were more appropriately matters of argument for counsel.  *Id.*, slip op. at *19-*24.

In *United States v. Batiste, et al.*, 2007 WL 5303053 (S.D.Fla. Nov. 7, 2007) (unpublished), Wedick was offered by the defense to dispute an agent's testimony regarding permission to record the post-arrest statements of one of the defendants, and the FBI's handling of discontinued confidential informants.  The trial judge excluded the testimony by essentially applying the precepts of Fed.R.Evid. 608(b) and finding that these matters were "collateral and immaterial to the matter at issue in [the] case," and that the sole purpose of Wedick's testimony was to improperly impeach the agent's testimony on a collateral matter.  *Id.*, slip op. at *4.  *See* Fed.R.Evid. 608(b) (specific instances of conduct of a witness may not be proved by extrinsic evidence to attack the witness' credibility).

In *United States v. Tubbs, et al.*, Case No. CR05-5828FDB (W.D.Wash), the defense had proffered that Wedick would testify as an expert witness "about FBI investigative practices and procedures, particularly report writing and the use of 'cooperating' witnesses."  The government objected on the grounds that the testimony was not reliable, not relevant, its probative value was outweighed by its potential to confuse the jury, and it violated the collateral impeachment rule.  In particular, the government stressed the impropriety of expert testimony that relates to matters within the knowledge and experience of ordinary people, and that simply repackages arguments about the facts that could be presented by attorneys through their cross examinations and closing arguments.  U.S. District Court Judge Franklin D. Burgess excluded Wedick's testimony, stating:

> Defendant Waters' Offer of Proof fails to address the Court's concerns or to meet the requirements of FRE 702.  For example, the proffer does not demonstrate the issue or issues that Wedick would address; what FBI rules, regulations, or procedures he relies upon; or what opinion he has as a result of applying the subject rules, regulations, or procedures to the facts.  All the proffer communicates are general conclusions that 'the agents in this case failed to follow

## C.     The FBI Did Not Exercise Bad Faith in its Handling of the Investigation

The time-line of events during the initial stages of the investigation beginning October 8, 2010, through the date of the first recorded conversation on October 29, 2010, was thoroughly documented by the confidential source and the FBI through contemporaneous notes, e-mails and reports, which are attached in Exhibit B to this motion.[3]   As these documents establish, the early chain of events in this case (much of which was previously summarized by the government in its initial motions response) was as follows:

----

standard and clearly established FBI procedures, that their actions violated FBI regulations, and that their work was sloppy and careless.'

*United States v. Tubbs*, *et al.*, Court's Order of February 6, 2008. [Exhibit C].  (Defendant Waters' case was subsequently reversed and remanded by the Ninth Circuit on other grounds. *United States v. Waters*, 627 F.3d 345 (9th Cir. 2010)).

One case in which the Court did agree to allow Wedick to testify was *United States v. Brown*, 2008 WL 510126 (M.D.Pa. Feb. 22, 2008) (unpublished).  *Brown* involved a hearing on the defendant's post-trial motion for judgment of acquittal or a new trial following his conviction for fraud, so issues of possible juror confusion were not presented.  The defendant called Wedick to testify about the procedures he had followed during his days as an agent "for outfitting a confidential informant with a body wire and recorder and for identifying the evidence."  *Id.* at *4 n.7.  While the court heard Wedick out, it was not particularly impressed by his testimony.  It noted that while Wedick had "substantial experience in the field of electronic surveillance and has taught numerous individuals his practices," and that it was "evident that he believes strongly that his practice is the correct one," he had been forced to admit that "this practice is not mandated by FBI policy or written standards," that he had no familiarity with electronic surveillance practices in the FBI's Philadelphia or Harrisburg offices, and, moreover that "his preferred practice has a flaw" which created the possibility that an informant could alter a tape recording before returning it to him.  This caused the court to reject the defense's claim that Wedick's approach was superior, or more consistent with FBI policy, than that followed by the case agent.  *Id.*

[3]   The documents contained in Exhibit B that are bate-stamped were provided previously to defense counsel in discovery.  The other documents constitute Jencks material for the case agent should he be called to testify on the issue herein.  In order not to implicate any privacy concerns, undersigned counsel has redacted third party and other identifiers.  Any information relating to operational activities and personnel has also been redacted.

**October 8, 2010** – The confidential source met with the case agent and alerted him to the defendant's public Facebook postings, to include postings on September 29, 2010 ("The sword is cummin the reign of oppression is about 2 cease inshallah ta'ala YA muslimeen! don't execept the free world we are slaves of the Most High and never forget it!"), and October 1, 2010 ("Any 1 who opposes ALLAH and HIS Prophet PEACE.Be.upon.Him I hate u with all my heart."). After their meeting, the case agent advised the confidential source: "You have the green light to speak with him. We don't yet have enough to open an investigation. But were always on the lookout for activity." The source responded, "Got it I believe something will come out of him." Ex. B at 1-2, 35.[4]

**October 11, 2010** – At approximately 8:57AM, the confidential source e-mailed the case agent advising he communicated with the defendant in a Facebook chat the previous day (October 10), prior to seeing him at the mosque. The source stated that the defendant wrote that he wanted to go to "Pakistan or Afghanistan (a country that struggle for the sake of allah swt.)." The case agent replied asking, "Is this the Nicaraguan saying he wants to go fight in Afghanistan?" The confidential source answered, "Yes." Ex. B at 3. According to the transcript of the chat, the confidential source told the defendant that he recognized the defendant's Facebook photo and believed that they had met at the mosque during Ramadan. The defendant asked the confidential source where he planned to be for prayers later that day. When the confidential source indicated he was free around 5:30PM, the defendant told him to meet him at the mosque. Ex. B at 4-6. (The transcript of the chat forwarded by the confidential source contains a picture of what appear to be armed rebel fighters that was posted by the defendant on his Facebook page on September 21, 2010, with the comment,

---

[4] As noted in the government's initial motions response, the confidential source first encountered the defendant at a local mosque during Ramadan in August 2010. Ex. B at 69.

"mishallah wish i waz there."  Ex. B at 5.)

**October 14, 2010** - The confidential source e-mailed the case agent advising that he had another Facebook chat with the defendant in the early morning hours that day.  He attached the transcript of the exchange.  Ex. B at 7-10.  The transcript indicates that during the chat, the confidential source apologized for having missed seeing the defendant at the mosque since their exchange on October 10.  The confidential source said he would "have loved to be in the great lands" if he was younger (referring to being overseas).  The defendant replied, "I'll meet u there ... my dream is to be amongst the ranks of the mujahideen ..."  When the source asked the defendant how soon the defendant might go overseas, the defendant replied, "Honestly I don't know brotha but inshallah im just going to keep asking ALLAH HE will open a door for me inshallah becuz man ..... jihad is all I think about when i sleep, when I wake up, sometimes i cry cuz im not there and kaffur killing our brothers and sister!  I am sure I will make it soon or later."  Ex. B at 8-10.

**October 17, 2010** – The defendant publicly posted the following on his Facebook page: "I love Sheikh Anwar al Awalki for the sake of ALLAH. A real insperation for the Ummah, I dont care if he is on the terrorist list! May ALLAH give him Kire ameen."  Ex. B at 32.

**October 21, 2010** - At approximately 1:01PM, the confidential source e-mailed the case agent that he was expecting to talk to the defendant that day on Facebook to set a time to meet with him the following day.  The source asked the case agent if he should end his contact with the defendant (whom he referred to as "Nicaragua").  The case agent responded, "No, keep engaging him." Ex. B at 11.

**October 22, 2010** - At approximately 7:54AM, the case agent e-mailed his supervisor that he was meeting with the confidential source that morning and would be back in the office by noon.

At approximately 2:13PM, the confidential source e-mailed the case agent that he had just finished meeting with the defendant and had dropped him off at the library where the defendant said he was going to do some research.  The confidential source indicated that the defendant had asked him, "how far can I go about jihad?" and stated, "I want to bring the fight to them and kill them as they killing muslim around the world."  The defendant also asked the confidential source if he knew "a few brother[s]" who would want to join, and if the source thought an individual they both knew from the mosque would be interested.  In his message to the case agent the confidential source stated, "I told him to not ask anyone because I don't want us to be betrayed.  He wants to meet tonight again."  The case agent replied, "10-4, thx."  Ex. B at 13.[5]

**October 25, 2010** –    The confidential source had a brief meeting with the defendant at a gas station, at which time the defendant talked again about attacking military installations.  (This was contemporaneously documented by the source in his notes.)

**October 27, 2010**

At approximately 8:32AM, the case agent e-mailed his supervisor that he was out with the confidential source.  Ex. B at 14.  During that debriefing, the case agent learned the details of the statements made to the confidential source by the defendant regarding his desire to attack military personnel.  Later that day, the case agent generated a report summarizing the information provided by the confidential source during the debriefing.  As reported by the source, the defendant: spoke about his desire to target military recruiting stations or "anything military;" suggested they could consider killing U.S. Army personnel where they lived; told the source he was saving money to

---

[5]  More details regarding the conversation on October 22 are contained in the notes made by the confidential source which were provided to the case agent on December 2, 2010 (and have been provided to defense counsel in discovery).

"equip" himself, and wanted the source to do the same because they "must be prepared" for jihad. The defendant also stated that he had a criminal record and could not buy a gun. He suggested that the source purchase a weapon for him and indicated that he had a rifle in mind that he had seen at a store in Maryland.  Ex. B at 15-16.

At approximately 3:08PM, the case agent e-mailed AUSA Harvey Eisenberg, Chief of the National Security Section of the U.S. Attorney's Office, to advise him, per Attorney General Guidelines, that the FBI would seek OIA authority to allow the confidential source to engage the defendant in consensually monitored conversations.  He noted in his e-mail message that the source had reported that "the subject is engaged in attack planning."  Ex. B at 17.

At approximately 3:14PM, the case agent e-mailed his supervisor a report seeking to formally open an investigation against the defendant.  Ex. B at 18.

At approximately 4:59PM, the case agent e-mailed the confidential source that more information was needed to identify the defendant.  He asked the source if he could get "an exact address or license plate" number.  He also stated: "More important, we need to know about the meeting AS SOON AS YOU LEARN ABOUT IT.  We'll need to meet at least 2 hours before you leave for the meeting location."  Ex. B at 19.

**October 28, 2010**

During the morning of October 28, the confidential source e-mailed the case agent various pieces of information regarding a possible residence for the defendant, and advised the case agent that he would be meeting with the defendant that night at 7PM.  Ex. B at 19-21.  At approximately 10:41AM, the case agent e-mailed his supervisor advising of a possible address for the defendant and other identifying information.  Ex. B at 22.  Later in the morning, the confidential source

17

responded to the case agent's question regarding the purpose and location of the meeting with the defendant. He indicated that the defendant wanted "to set the upcoming meeting with the rest of the group" (meaning others interested in joining an attack on the military). The source advised that he would notify the case agent of the exact location of the meeting. Ex. B at 23-24.

At approximately 12:23PM, in response to an e-mail from his supervisor outlining a possible investigative plan going forward, the case agent advised, "OIA is apprvd. Will attempt recording mtgs." Ex. B at 25. At 12:24PM, the case agent e-mailed his supervisor indicating that he wanted to get grand jury subpoenas and asking if an AUSA was at the FBI office. Ex. B at 26.

At approximately 2:44PM, the case agent's supervisor e-mailed the case agent and other FBI personnel to remind them to include in internal reporting that OIA authority had been obtained, that efforts would be made to consensually monitor the next meeting, and that surveillance would be put in place on the "target address" the next day. Ex. B at 27. At approximately 2:49PM, the case agent e-mailed his supervisor that the confidential source anticipated seeing the defendant later that night for the purpose of determining the date and location for a wider group meeting. Ex. B at 28.

At approximately 3:03PM, the case agent's supervisor e-mailed the case agent and other FBI personnel setting forth an investigative plan, to include identifying the defendant, analyzing the defendant's Facebook account, surveilling the known address, identifying the defendant's associates, and working with an AUSA to get grand jury subpoenas. The supervisor also noted that the defendant "will likely call the timing of the meeting" with the source, and that the source "is being instructed to delay meeting" until the office can obtain a recording device. Ex. B at 29.

At approximately 4:25PM, the confidential source e-mailed the case agent portions of the defendant's public Facebook page. Ex. B at 30-36.

At approximately 4:31PM, the case agent's supervisor sent an e-mail to certain FBI personnel, copying the case agent, advising that if FBI Headquarters decided that surveillance of the defendant must be conducted "24/7," than support would be needed from other offices.  He also stated, "My opinion at this juncture is we do not yet need to go 24/7 as this 'plot' is still in the planning stages and not yet imminent.  We also have a CHS [confidential human source] directly in the mix."  Ex. B at 37.

At approximately 4:47PM, the confidential source resent the case agent, via e-mail, portions of the defendant's public Facebook page.  Ex. B at 38-40.  At approximately 4:49PM, the case agent advised his supervisors and other FBI personnel of the identifying information contained on the defendant's Facebook page.  A criminal history inquiry subsequently turned up negative suggesting that the name Muhammad Hussain might be an alias.  Ex. B at 41-42.

At approximately 5:18PM, the case agent's supervisor e-mailed the case agent stating, "Ideally, we would want [   ] to record as many conversations as possible.  Would it be feasible to get him an [recording device] for tonight's meeting?"  The agent responded, "Not at this point."  Ex. B at 43-44.

At approximately 6:40PM, the case agent e-mailed the confidential source telling him to call when he was through meeting with the defendant.  At approximately 10:11PM, the confidential source e-mailed the case agent that the meeting was done.  Ex. B at 45-46.

**October 29, 2010**

At approximately 6:41AM, the case agent e-mailed his supervisor and other FBI personnel reporting on information received from the confidential source early that morning about the previous

night's meeting with the defendant.[6]  The case agent stated: "Some bullets from an early morning conversation with my source: MH's true name is Antonio.  He works in construction (may leave the house early).  He noted that there is an armed forces recruiting center on Route 40.  He stated that propane tanks would work well in an attack.  I will meet with the source today to get more details.  Source planned to meet with him again tonight.  I plan to record the conversation."  Ex. B at 47.  Later that day, the case agent generated a brief report documenting this information.  Ex. B at 48.

The case agent subsequently generated a more detailed report on November 20, 2010, documenting the events of October 28 (mistakenly listed as October 21).  In that report the agent noted that the defendant and the confidential source were joined by another individual during the meeting.  The defendant spoke to this individual in general terms about jihad; this individual was not interested in jihad and provided the defendant with the name of another individual he thought might be interested.  After this individual parted ways with the defendant and the confidential source, the defendant indicated, while the source was driving him home, that they had just passed the military recruiting center he wanted to attack.  Ex. B at 49.

At approximately 8:28AM, the confidential source identified the defendant from a photo e-mailed to him by the case agent.  Ex. B at 50-51.  At approximately 9:22AM, the confidential source e-mailed the case agent information regarding the location of the residence of the defendant's mother.  Ex. B at 52, 55.  At approximately 9:37AM, the case agent e-mailed his supervisor and other FBI personnel that the defendant had been positively identified as Antonio Martinez, and provided two possible addresses believed to be associated with him.  Ex. B at 53.  Shortly thereafter,

---

[6]  The confidential source's contemporaneous notes of the meeting have been provided to defense counsel in discovery.

the case agent confirmed the defendant's criminal history and advised his supervisor and the U.S. Attorney's Office via e-mail.  Ex. B at 54.

At approximately 3:41PM, the confidential source e-mailed the case agent that the defendant told him to meet him later that day between 7:45 and 8:00PM.  Ex. B at 56.  Later that evening, the confidential source met with the defendant and engaged in a consensually recorded conversation. Ex. B at 57-59, 61.  At approximately 9:06PM, the case agent e-mailed his supervisor and other FBI personnel advising that surveillance had followed the confidential source and the defendant and observed them circling an army recruiting station.  The case agent's supervisor responded asking if the confidential source had a recording device.  The case agent responded that he did.  Ex. B at 60.

### October 30, 2010

Beginning at approximately 6:03PM, the case agent and his supervisor engaged in a series of e-mail messages regarding the fact that surveillance agents could not locate the defendant and discussing some possible alternatives on how to try to find him.  At approximately 6:22PM, the case agent e-mailed his supervisor that the confidential source was going to meet with the defendant at 7:45PM, and that there would be no recording because the meeting was not planned and the agent had no recording device.  Ex. B at 62.

At approximately 8:14PM, the confidential source e-mailed the case agent that he was with the defendant, and then later that the defendant was no longer with him.  Ex. B at 63.  At approximately 11:37PM, the case agent e-mailed his supervisor the location that the confidential source had taken the defendant, and that surveillance agents had missed it.  Ex. B at 64.

### October 31, 2010

At approximately 12:20PM, the confidential source e-mailed the case agent that during the

meeting with the defendant the night before, the defendant stated, "Allah is opening the door of this mission mash allah, I am up for it, down for it and all for it." The case agent replied that the defendant needed to get a phone so that the agents could listen to him better. The source responded: "The phone part will be for us to keep track on him because he will not talk about such thing over the phone and he insisted on that." The source then quoted the defendant as saying the previous night, "I don't want to be caught like a chick, I want the mission done b4 anything happen because most likely we won't stay alive therefore may Allah grant us Jannah [paradise]." The source indicated that the defendant had also talked about his wife and how he might not see her if "Allah opens the door." Ex. B at 65. The case agent subsequently memorialized information received from the confidential source regarding the October 30 meeting. Ex. B at 66-68.

## D.    Conclusion

The defendant has failed to meet his burden of showing the exercise of bad faith by the FBI, or the need for an evidentiary hearing on the issue. The documentary evidence of how the investigation in this case occurred clearly establishes the lack of bad faith in the manner in which the underlying investigation was conducted. The actions taken by the agency, in both directing the confidential source and determining the appropriate time for recording, and the reasons for those actions, are spelled out in plain English. The opinions of the defendant's proffered expert are irrelevant and unreliable, as they are based on erroneous facts and flawed analysis, are premised on conjecture and speculation, concern a collateral issue of no moment to the constitutional claims raised by the defendant, constitute improper collateral impeachment of the credibility of both the confidential source and the case agent, and seek to invade the province of the Court and the jury. For these reasons, the defense should precluded from offering the testimony of Mr. Wedick either

at the motions hearing, or at trial.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____/s/_____

Christine Manuelian
Assistant United States Attorney
National Security Section
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800