**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2012 JAN 26 PM 1:13

CLERK'S OFFICE
AT BALTIMORE
BY ___ DEPUTY

Rod J. Rosenstein
United States Attorney

Christine Manuelian
Assistant United States Attorney

36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201

DIRECT: 410-209-4852
MAIN: 410-209-4800
FAX: 410-962-9293
TTY/TDD: 410-962-4462
Christine.Manuelian@usdoj.gov

January 4, 2012

Joseph A. Balter
Deputy Federal Public Defender
100 South Charles Street
Tower II, Suite 1100
Baltimore, MD 21201

    Re:    *United States v. Antonio Benjamin Martinez, a/k/a Muhammad Hussain*
            Criminal No. JFM-10-0798

Dear Mr. Balter:

       This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by January 16, 2011, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

       1.       The Defendant agrees to plead guilty to Count Two of the Indictment now pending against him, which charges him with attempted use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(3). The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court. This plea is being entered pursuant to the terms of Federal Rule of Criminal Procedure 11(c)(1)(C).

### Elements of the Offense

       2.       The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are that on or about December 8, 2010, the defendant did (1) knowingly attempt, (2) without lawful authority, (3) to use a weapon of mass destruction (as defined in 18 U.S.C. § 921(a)(4)(A) and (C) to include a readily convertible explosive bomb), (4) against any property within the United States owned or used by the United States, or by

Revised 11/5/09

an department or agency of the United States.

## Penalties

3.  The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: life imprisonment, a term of supervised release of 5 years pursuant to 18 U.S.C. § 3583(b), and a fine of $250,000 pursuant to 18 U.S.C. § 3571(b). In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.  The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    (a) If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    (b) If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    (c) If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

(d) The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

(e) If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

(f) By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

(g) If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

(h) By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

(5) The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

(6) This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

(a) The parties agree that pursuant to U.S.S.G. § 2M6.1(a)(1), the base offense level is 42, as the offense was committed with the intent to injure the United States.

(b) The parties also agree that as the offense involved, or was intended to promote, a federal crime of terrorism (defined under 18 U.S.C. § 2332b(g)(5) as an offense "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"), the guideline level is enhanced pursuant U.S.S.G. § 3A1.4 to level 43, Criminal History Category VI.

(c) This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. **The resulting offense level is forty (40).**

(7) The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of 25 years imprisonment is the appropriate disposition of this case that adequately reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from further crimes of the defendant. This agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, *either* party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

(8) This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range and application of the 18 U.S.C. § 3553(a) factors, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines or in 18 U.S.C. § 3553(a) will be raised or are in dispute.

### Obligations of the United States Attorney's Office

(9) At the time of sentencing, this Office will move to dismiss Count One of the Indictment.

(10) The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the count of the Indictment that this Office has agreed to dismiss at sentencing.

### Waiver of Appeal

(11) In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

   a) The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

   b) The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds 25 years imprisonment; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below 25 years imprisonment.

   c) Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

   d) The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

(12) The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his

conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

(13)    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. In the event that the Court seeks to impose a sentence other than that set forth in paragraph 7 herein, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

## Entire Agreement

(14)    This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Christine Manuelian
Assistant United States Attorney
National Security Section

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

1/20/2012
Date

Antonio Benjamin Martinez
a/k/a Muhammad Hussain

I am Mr. Martinez's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

1-20-12
Date

Joseph A. Balter
Deputy Federal Public Defender
Counsel for Antonio Benjamin Martinez

## ATTACHMENT A
## STATEMENT OF FACTS

The undersigned parties stipulate and agree that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.

In October 2010, defendant Antonio Benjamin MARTINEZ, a/k/a Muhammad Hussain, a then recent convert to Islam, expressed to a Baltimore FBI confidential human source (CHS) his desire to attack and kill military personnel. During the course of numerous recorded conversations that followed between MARTINEZ, the CHS, and later an FBI undercover agent, MARTINEZ identified his intended target - an Armed Forces recruiting center on Route 40 in Catonsville, Maryland - and spoke at length about his anger towards America, his belief that Muslims were being unjustly targeted and killed by the American military, and his desire to commit jihad in this country to send a message that all American soldiers would be killed so long as the country continued its "war" against Islam. MARTINEZ attempted to recruit a number of other individuals to join with him in the operation, including an individual whom he said had the ability to obtain weapons. All of them declined, with one of them expressly attempting to dissuade MARTINEZ, in the presence of the CHS, from committing jihad. Thereafter, MARTINEZ agreed to meet the CHS's "Afghani brother," whom the CHS represented would be interested in assisting in the operation. The "Afghani brother" was the undercover FBI agent (UC) whom MARTINEZ embraced as the answer to his "prayers."

MARTINEZ first raised the subject of attacking military targets during an unrecorded encounter with the CHS on October 22, 2010. During the course of this meeting, MARTINEZ told the CHS that if the military continued to kill their Muslim brothers and sisters, they would need to expand their operation by killing U.S. Army personnel where they lived. He stated that jihad was not only in Afghanistan or Pakistan, but also in the United States. Because MARTINEZ believed his own criminal record precluded him from purchasing a gun, MARTINEZ suggested that the CHS purchase a weapon for him. On October 28, 2010, during another meeting with the CHS, MARTINEZ spoke about the possibility of using gas or propane tanks sold by a "brother" he knew at a gas station. It was during this meeting that MARTINEZ first identified the recruiting center as his intended target.

On October 29, 2010, during a recorded meeting with the CHS, MARTINEZ had the CHS drive him to the Armed Forces Career Center at 5439 Baltimore National Pike in Baltimore, Maryland. The center is a stand-alone building that is leased by an agency of the United States and used as a recruiting center for various branches of the military. MARTINEZ indicated that he wanted to attack the location in about a month. MARTINEZ said he knew of someone who could provide them with weapons, and detailed how he could get on the roof, go inside, and wait for "them" (the military members) to arrive, and that he and the CHS would then "shoot everybody in the place." MARTINEZ acknowledged that he had been at this location seeking to join the military

1

prior to his conversion to Islam. MARTINEZ suggested burning the building down to "instill fear" and to send a message that whoever joined the military would be killed. MARTINEZ said he thought they could use a propane tank for the operation, but he and the CHS would have to learn how to "rig it." He also described how they could stuff socks into the exhaust pipes of cars used by the soldiers in order to suffocate them while they were driving. MARTINEZ referred to Islamist extremists, such as Anwar al-Aulaqi, whose views he respected, and outlined possible getaway plans, such as setting up camps in the woods "like ... the Chechyan brothers" fighting in Russia. MARTINEZ reiterated his thoughts about using explosives in a recorded meeting with the CHS on November 3, 2010, during which he described how to make homemade bombs. He suggested that they could toss the bombs into the recruiting station and then shoot personnel as they ran out.

During a recorded conversation with the CHS on November 4, 2010, MARTINEZ stated: "I have a desire to die in the cause of Allah ... And if I go to hell for that, then I'll be happy ...we blow one recruiting center up ... People ain't gonna be able to ... get recruited at that one ... Then we hit another one, then we hit another one ... there's no more recruiting centers in ... Maryland. So nobody bein' recruited into the Army in Maryland. So we stop one thing then we can start on somethin' else ... And just keep it movin' ...So what ... if it's just a little ... recruiting center? ... it show that the Muslims are united ... are one in this war ... one in this effort ... I just want us to do the right thing ... This ... is what we gotta do. Insha'Allah. Insha'Allah ... Do it for jihad." MARTINEZ reiterated his mindset in a recorded meeting on November 10, 2010, telling the CHS: "we gonna hit 'em where it hurts ... We are gonna go ... to their stations, to their bases, to everywhere ... to everywhere a soldier is. Every soldier that we see in uniform will be killed on the spot, Insha'Allah ... They will be killed until they stop waging war against ... Islam ... We won't stop, Insha'Allah, until they kill us or they lock us up ... this is for Allah."

Both prior to, and during the course of, the investigation, the defendant articulated his militant beliefs in numerous postings on his public, open source Facebook page and in two Facebook chats with the CHS. These postings included the following:

8/14/10 - "Man.........Subhanallha! When are these crusaders gonna realize they cant win? How many more lives are they willing to sacrifice. ALLAHUAKBAR"

9/29/10 - "The sword is cummin the reign of oppression is about 2 cease inshallah ta'ala YA muslimeen! don't execept the free world we are slaves of the Most High and never forget it!"

10/1/10 - "Any 1 who opposes ALLAH and HIS Prophet PEACE.Be.upon.Him I hate u with all my heart."

10/10/10 - MARTINEZ told the CHS in a Facebook chat that he wanted to go to "Pakistan or Afghanistan (a country that struggle for the sake of allah swt.)."

10/14/10 - "Do you really want to spend your entire lives praying for longevity? WE

2

were born in order to die." That same day, MARTINEZ told the CHS in a Facebook chat that it was his dream to be among the ranks of the mujahideen and that he hoped Allah would open a door for him because all he thinks about is jihad.

10/17/10 - "I love Sheikh Anwar al Awalki for the sake of ALLAH. A real insperation for the Ummah, I don't care if he is on the terrorist list! May ALLAH give him Kire ameen."

11/4/10 - "What can you do with them? If u lock them up it is a time to get close to ALLAH, If you exile them it is a spiritual journey, and if u kill them hannah and the women of paradise await. lol!!! victory is 4 Muslims regardless, ALLAH is the Greatest."

11/7/10 - MARTINEZ provided a link to a YouTube posting entitled "Nasheed: Al-Qawlu Sawarim," a Dutch video showing mujahideen attacking western coalition forces.

MARTINEZ first met the UC on November 16, 2010, at which time he advised the UC that he wanted engaging in jihadist activities to be his "profession." During a recorded meeting with the UC on November 17, 2010, MARTINEZ indicated that he did not want to take action just for one day, but rather, wanted to dedicate his whole life to the cause, and learn how to build a bomb so that he could teach the next "young brother" who decided to fight. On November 22, 2010, MARTINEZ expressed his opinion to the UC that it was wiser to use a vehicle bomb in the attack, as it would prevent a "shoot-out" with the police and allow them to "live to fight another day" both here and abroad and go to Afghanistan.

Throughout the investigation, MARTINEZ was given multiple opportunities by both the CHS and the UC to put a stop to his planned operation, but he repeatedly expressed his desire to go forward with the attack. During a recorded meeting with the UC on December 2, 2010, MARTINEZ reiterated his commitment to the attack. He discussed the particulars of how the operation would be conducted, and directed the UC to start preparing the vehicle bomb for an attack the following Tuesday. MARTINEZ stated that he would get on the Internet to find out when the soldiers reported in and out of the building. Later that evening, MARTINEZ had the CHS drive him to the recruiting center. Once there, MARTINEZ assessed the area around the building to determine the best location to park the vehicle containing the bomb in order to achieve maximum results. MARTINEZ drew a diagram of the area noting where the vehicle bomb should be parked and gave it to the CHS to give to the UC.

On December 4, 2010, during a recorded phone conversation, MARTINEZ told the CHS that he was "ready ...happy, anxious, just ready" about the upcoming attack. When asked by the CHS whether he was going forward with the attack because he felt "like someone pushing you," MARTINEZ replied, "I came to you about this, brother."

3

On December 7, 2010, MARTINEZ met with the UC to learn how to operate the detonation device and inspect the vehicle to be used and the bomb components contained therein. MARTINEZ inspected the passport the UC had prepared for him, which the UC indicated would be utilized by another "brother" to get their travel visas to leave the country a few days after the attack. MARTINEZ showed the UC his map of the recruiting center and told the UC where he believed it was best to park the SUV the next morning. It was agreed that the UC would walk inside the building and that MARTINEZ would drive the SUV to the center and park it. It was also agreed that all three men would drive separate vehicles, and the CHS would pick up MARTINEZ after the SUV was parked at the center. MARTINEZ and the CHS would then drive to a vantage point where MARTINEZ would detonate the bomb. The parties agreed that after the operation was over, they would not meet until Friday to arrange their getaway.

Later that evening, MARTINEZ sent the following message to the CHS via Facebook:

In the name of Allah most gracious most merciful, praise be to Him and may He send peace and blessings to our beloved prophet Muhammad pbuh his sahaba and family Alhamdudillah! My beloved brother Alla'tala has chosen us for implementation of His deen and iam proud of sharing this time with u bcuz this is a life long journey, a journey that will require patience, sincertiy, unity, and most importanly the reliance on Allah. O my beloved brother I love u for the sake of Allah you are of me and I am of you and with the help of Allah we will be victorious inshallah may He accept us. Ameen.

On December 8, 2010, MARTINEZ met with the CHS to drive to a public parking lot near the recruiting center. On the way, MARTINEZ had the CHS tape him on a camcorder making a statement that he and other "mujahideen" would continue to fight against the oppressors until those who waged war with Islam stopped their actions. After they arrived at the parking lot, the UC gave MARTINEZ the keys to the vehicle containing the (inert) bomb. MARTINEZ proceeded to arm the bomb in the parking lot. He then drove the SUV to the recruiting center, parked it in front of the building, and left with the CHS in the CHS's vehicle to go to a vantage point near the center. Upon receiving a phone call from the UC confirming that six soldiers were in the building, MARTINEZ attempted to detonate the device, at which time he was arrested.

Following a Miranda advisement shortly after his arrest, MARTINEZ voluntarily waived his rights and made a full confession. MARTINEZ stated, among other things, that: the attack on the recruiting center was his idea; he was doing it for the right cause; he was a mujahid - a "holy warrior" - and wanted to be a "shaheed" (martyr); he parked the SUV in front of the building to give the explosion more "umph," expecting that it would level the front where the soldiers were and insure that they died; he thought his act would have two possible outcomes - either he got locked up or he succeeded; and he had tried to round up other "brothers" to participate, but they did not feel the same way about jihad.

**SO STIPULATED:**

4

_____                _____
Antonio Benjamin Martinez                      Joseph A. Balter
a/k/a Muhammad Hussain                         Deputy Federal Public Defender
                                               Counsel for Antonio Benjamin Martinez

5